I call the third matter then, listed for oral argument for the morning, which is N. Ray Modafinil antitrust litigation. Oh my. Can I pull up this chart? Certainly. Boxes. Boxes have boxes. Takes me back to practice. Good morning. Mr. Wilson. Yes, sir. Rowan Wilson for Swayne and Moore for Milan. Mr. Baldrige is going to deal with, representing Ranbaxy, is going to deal with the numerosity issues. Could you lift the microphone a little bit? I'll tell you what. You should switch. I think you should switch. While I realize that, I did not realize that there were two people arguing. I realize that the blue brief ordered the issues by predominance first and numerosity second. But I think given, if nothing more than the structure of Rule 23, we ought to address the numerosity issue. Absolutely. Because its resolution may affect resolution or the need to resolve the other issue. So Mr. Baldrige. You know changes scare all of us lawyers, so we'll see if the first serves me well. Good morning. Doug Baldrige from Venable on behalf of Ranbaxy. I'm going to address the numerosity issues. The way I look at the lower court's decision on numerosity is this. Can I ask if you're reserving rebuttal? I am not. I only have five minutes and I will hopefully be succinct. In certifying what is the smallest Hatch-Waxman antitrust class ever certified. Now you made that assertion in your briefing. What foundation do you have for that? How do we know that? Simply surveying all the cases and having been in the Hatch-Waxman cases for over a decade now, I will tell you maybe there's one in there. I don't know about it. If there is one. As far as you know, this is the smallest class. And irrespective of that, under everybody's jurisprudence, not only ours beginning going back to Stewart, but other cases from other circuits as well, 22 is a relatively small number in the numerosity area. And 22 is under challenge given that three of those are by virtue of assignments we challenge and one of the purported class numbers. But how is it abuse of discretion? We've got an abuse of discretion standard here. Just a moment please. Let's start with the structure of Rule 23A. And let's begin with the language of A. Because that's what we need to deal with is the text of subsection A1. What's it say? Well, is it so numerous that the preferred method, and I'm obviously not quoting the rule, is to proceed in a class action context? And the standard that this court... All right. If you're stopping there and then you're going to move on to Joinder, that's fine. I was going to move on to the standard about whether this is a case where Joinder is impractical. And the answer to that is I don't see any circumstances under which... We have a text that speaks, that is silent on the issue of an exact number or even a range of number. Right? I think that's correct. So we've really had to develop jurisprudence this court and others through the good old common law method of deciding case by case what is so numerous. I think you can't really get more clarity, and it's not perfect clarity, than the Weiss versus York Hospital case, which basically cut the line at 21. There's a nationwide survey that was cited by a Western District of Virginia case outside of the Third Circuit that said about 25, as you're known. It's hard to draw clear lines, though, with that textual language. Absolutely. So we really then have to move on to the term Joinder and the considerations that come into play for purposes of Joinder. Couldn't agree with you more. Okay. So what consideration did the district court give here? And what explicitly did he set out in his opinion were factors that should play into whether or not Joinder was impracticable? The first factor that Judge Goldberg at the district court level placed great weight on was whether Joinder of absent class members would somehow trigger the appellee's right to conduct additional discovery. That was the first thing he weighed enormous weight on. Why should that be a factor affecting numerosity? It isn't. I mean, this is a B3 action, and quite clearly that would be a highly relevant factor to take into account in terms of superiority, for example. Well, that's exactly what was said in Bissell out of the Sixth Circuit, 708 F. 3rd, 747. Is that superiority? Is there any way that it can inform the impracticability inquiry for Joinder purposes? Now, could it impact impracticability? Perhaps. Does it impact numerosity? I think if you're looking at whether an enormous flood of additional discovery early on in the case of class certification as opposed to later in the case could have some impact on deciding whether to certify a class, but that's not our situation here. The timing of this was very late by the court's choice to certify the class late, and the bottom line is the fact that- Should that be a factor? Should the age itself of the case, which seemed to animate Judge Goldberg to some extent in his desire to move on, should that impact the A1 inquiry? Well, according to, I think, Amkin products out of the United States Supreme Court, no. I don't think that economies of time, scale, expense can outweigh procedural unfairness. We have a right to have the impracticability analysis done. Can't outweigh it, but our own precedent has said that judicial economy is a feature to be considered in thinking about impracticability of Joinder, right? As long as it doesn't result in procedural unfairness, number one, and number two, it's not a numerosity issue. Well, numerosity is a shorthand for the impracticability standard, right? I mean, we're talking about the same thing. Numerosity is just a way of saying impracticability of Joinder, correct? In part, yes. Well, not in part. I mean, I've spent a fair amount of time on the literature and on the cases, and from what I can tell, it's not the number alone. The number is a feature in assessing impracticability. And numerosity is only a shorthand to mean the overall impracticability standard. Is that not right? I think that's fair, yes. Okay. So we may use the word numerosity, but we all understand we're not just talking about the number. We're talking about impracticability. And when we say that, the district court has to make a judgment about that impracticability. Now, my question for you is a standard of review question. You've argued in your briefing that this is a de novo standard of review. Your opponents have argued that it's an abuse of discretion review. I'm wondering whether it's a clearly erroneous standard of review. Is the question that the district court answers, when it answers the question of impracticability, is that a question of fact or law? In this particular case, when you consider factors that are not factors, they're not court-established factors under numerosity, it is an issue of law and it's a de novo standard. Okay. So you're suggesting that when you use the term factors, one factor would be the pure number factor. Is that right? The geographical dispersion, which was discussed by Judge Goldberg, would be a factor. So whether or not those factors are included, that is a question of law? Yes, sir. Whether you consider the correct factors. If these cases are brought in 13 different states and Puerto Rico, which is where the class members are citizens, how could they be joined? Well, the only thing I can give you as a practical answer there, Your Honor, is that nine of the op-elts have already joined with Apotex. Every one of the named class plaintiffs is out of a different area of the country and has joined in this case. Every one of these class plaintiffs is highly moneyed, highly capable. No, no, no. I'm talking about the impracticability of joinder. Isn't joinder impracticable here? Can they be joined into a single action? I'm looking at 23A1. The class is so numerous that joinder of all members is impracticable. It is impracticable, isn't it? The question is not… As a practical matter? As a practical matter, is it impracticable? Yeah. I don't know. I don't know what the standard means in that context. Well, but Judge Goldberg made a judgment that it was. Pardon me? Judge Goldberg made a judgment that it was. And you want us to say, even though you don't know, you want us to say that he was so wrong that we should go the other way. No, I want you to look at the factors he considered, which are not factors under the numerosity standard, which is an error of law. Additional discovery is not an issue to be determined under numerosity. The factors are out there as much as a matter of commentary and treatises as they are anything else. I mean, what jurisprudence in this circuit on numerosity can you point to or how much jurisprudence can you point to that suggests a list of factors we need to consider for purposes of impracticability? Well, I think what you're pointing… None of it's textual, that's for sure. I think what I would answer that is I could point to the absence of jurisprudence that applied the particular factors Judge Goldberg… Well, that's what made Goldberg's question so interesting. Yeah, he did not have support for the factors he applied in numerosity. The second one being to answer your question, Judge Smith, was whether separate trials could result in inconsistent verdicts. Well, that's not a numerosity issue at all, I would say. And number two, that's always the potential. There's always a potential of inconsistent verdicts when more than one plaintiff has a similar claim. It is not a determinative factor in assessing numerosity. So what essentially happened here, those were the two big factors for him. He looked at a number of other factors, like are the plaintiffs sophisticated? He found that factor in favor of not certifying the class. Are the claims big enough? Well, in large part, yes. He found five other claims that he thought might not be big enough to justify pursuing a loan. But overall, he found that factor in our favor. Are the plaintiffs, in this case, capable of litigating these cases? Sure, they're all enormous companies, with a few exceptions, pursuing large claims. So in the sea of factors, he found a number of them in our favor. The only two he found against us, there's no jurisprudence at all to suggest they're numerosity factors at all, that being possible additional discovery and the opportunity for inconsistent verdicts. So what really happened here, we all have been in this case for, I was thinking the other day, my daughter was in fourth grade. She's now a senior in college when this thing started. He wanted to get this done, and that's the bottom line. He wanted to get it to trial and get it done now, and he didn't look at the correct factors. I need some help still with the standard of review. I understand your argument that he looked at the wrong factors, and that's an error of law. So I get your position. I still would like to have your view, if you've got one, on the question of whether 23A1 calls for a decision of fact or a decision of law by the district court, or some mixed question. That's fine if you say it's a mixed question of law and fact, but what is it? Because he says, and I'm quoting from page 8 of the district court's opinion, that the numerosity prerequisite requires a plaintiff to show by a preponderance of the evidence that the proposed class is so numerous that joinder of all absent class members would be impracticable, citing Will Buten. That sounds like he thought he was making a finding of fact based on a preponderance of the evidence. Is he right or wrong about that? Well, the way I understand it, and that's all I can give you is this. If it is starting with what are the legal factors that are appropriately considered under the prong, that is a question of law. If it's the application of the facts to that law, that's clearly not purely a question of law. It's a mixed question. Our position is the factors he identified under numerosity are not factors that are considered under numerosity. One might be a superiority factor, as Judge Smith noted. One might fit into another context within the rule, but it's not numerosity. Determining how many is clearly a factual determination. Yes, sir. Right? That one's easy. Geographic dispersion, factual matter, right? Yeah, I think that's fair. Eventually, when the district court has to take all of these considerations, and perhaps specific factual determinations made even within what is or is not an appropriate factor, that eventual determination by him, is that abuse of discretion? That is the determination, ultimately, of impracticability. Let me take it to its extreme. Is it just a mush that's not subject to appellate review? Well, a mush sounds like a combined question of law and fact. What it is, is you have to start with the structure of the rule, as you point out. And if you go to numerosity, you have to first jump the hurdle of what are the legal factors. He never got by that hurdle because he did not select factors acknowledged in the law as applying to numerosity. Once you get beyond that and you get into the mush, yes, he's got to apply facts to law. When you say he selected factors that are not, I mean, there's case law and secondary resources that talk about judicial economy as being a factor in the impracticability analysis, correct? And there's also cases that talk about judicial economy being a superiority issue, perhaps. So are you saying judicial, the question is, is judicial economy a legitimate factor for him to have considered? As long as under Amkin, it doesn't outweigh procedural fairness. Okay, well, clearly, I mean, that's a little like saying you can do it as long as you don't violate the Constitution or something. Yeah, give it, okay? But judicial economy is something that was not illegitimate for him to think about, was it, or was it? Correct, and he could have. Was it because it followed in numerosity? No. And he thinks and he speaks about it in terms of judicial economy. Give us something to work with. You say it's problematic what he did because he thought about discovery and the burdens of discovery. He thought about trial and trial delay, and he thought about and talked about numerous trials, seriatim trials. He talked about all those things. He couched that all as judicial economy. Why was he wrong to think about those things under the rubric of judicial economy? I can't answer that question to be direct with you other than to say within the subset of numerosity, I cannot find a case where he was appropriate in considering those factors. Can he look at judicial economy in the soup of the entire class certification issue? Yes, he can. Well, let's look at what he does here. At J8-021, he says, Plaintiffs have also demonstrated the class are geographically diverse, which has the potential to create problems if all class members were to join the litigation. Undisputed, respective class members are spread out over 13 states and Puerto Rico. Considerable geographic dispersion would certainly present challenges, particularly if additional discovery were required. Therefore, geographic dispersion weighs in favor of a finding that joinder is impracticable, which is the test. And then at the end, he says, the complexity, extensive history, expansive discovery, et cetera. While some factors weigh in defendants' favor, I find those factors less compelling. And he's finding, to me, he's finding that the fact that it's going to be very difficult is going to weigh very heavily. And so, you know, he talks about a lot of things, but I think it's really subject to dispute that he bases his decision on things that are inappropriate. Can you read this differently? I don't. And I'm not helping you here, I realize that. But the context within which I'm looking at this is within the numerosity context. Okay. Did he, in the big, broad decision looking at all the factors under 23F, perhaps consider some factors that have applicability to whether or not to certify a class? Yes. But do they fall within the rubric of numerosity? They don't. Well, when you say you're not being helpful here, I mean, perhaps that is not at all your fault. And I'd like to hear from both sides about this as we go along, because maybe this court needs to deal with numerosity in a presidential opinion or two with greater specificity than it has before. Is that something we should do? I think that's right. I'll take that lifeline. No, I think that's right. I think it is mushy, and it's hard to figure out what actually applies and what doesn't apply. But the only way I know how to do it is put it within its proper box so it is subject to appropriate review. All right, thank you. Mr. Baldrige, we'll move on here from Mr. Wilson, but depending upon how the argument goes for both of you as well as for Mr. Gerstein, perhaps, I mean, I'll leave it to the two of you to determine who wants to use the rebuttal time. It may be that you have some change of heart. If you do, that's up to you. If not, that's fine, too. Thank you, sir. All right, thank you very much. Mr. Wilson. Well, Judge Smith, your last comment doesn't bode too well for me, but let me start anyway. No, nothing intended at all. Since we threw you off, I thought that it was only fair to provide that option. I'm attempting to joke with you. So let me start with the Comcast problem we have. There had been, and the Court knows this, but for the benefit of nobody else, of the high school students who were here, there was a claim of an overarching conspiracy involving the brand company Cephalon and four different generic defendants. That claim was thrown out by the district court. The model of damage and injury presided by Appalese was one in which the entire market damage was ascribed to that conspiracy. Fine. But when that claim was – A hub-and-spoke conspiracy. A hub-and-spoke conspiracy, essentially, or one not necessarily even hub-and-spoke. You could think of it that way, except these are all – I think of hub-and-spoke normally as a vertical, and then a bunch of horizontals were drawn together by the hub, and these people are actually all on the same level of distribution. They're all manufacturers of pharmaceuticals. Whether it's hub-and-spoke or simply a horizontal conspiracy, though, what we're left with now are four separate alleged restraints of trade, one from each of these settlement agreements, and the damage and impact model doesn't match anymore. This is a failure under Comcast. Well, you say it doesn't match anymore. The other side, they'll speak for themselves. I understand their position to be that it certainly does match, that our expert came forward and said, well, we have damages that we can look at with generic filers 1 through X. It didn't say Ranbaxy. It didn't say Mylan. It didn't say Barr. It just said generic, generic, and here's how it will work with two players, three players. Why does it matter whether your name is on it as opposed to a model which has generic players 1 through 3 or 4? Because that model was designed to measure the difference in price, the market price of modafinil, depending on how many competitors there were in the market. It was not a model that does what Comcast requires you to do, which is to say, for example, if the Mylan agreement is anti-competitive but none of the others are, what then is the injury to which of the plaintiffs? That model doesn't purport to do that at all. In fact, what the appellants at Applee say here is not one of these agreements causes any injury. It's the combination of the four of them that do, and the way that the injury works is if – I didn't understand that to be their experts. No, it's not what they – Help me here if you would. First of all, my understanding of Comcast, my recollection of it is it involved four separate theories of injury that caused four separate harms. Correct. Is that correct? Correct. A simple but accurate – Yes. My understanding in Plaintiff's case here is that their theory is that both the global conspiracy and the four individual conspiracies caused the same harm. Isn't that what they're alleging? And the way that they are alleging the second piece is to say that if any one of the four – so we put aside the overarching conspiracy now because that's gone, right? So let's just focus on the four individual ones. Their argument, the reason that they say that the total market damage is still ascribable to any one of these agreements is because if one of the agreements in the but-for world didn't exist, that it's anti-competitive so we take it out, then what would have happened is the other generics and probably some other people as well would also have launched generic modafinil. And therefore, they're trying to attribute to Miland's agreement or to Ranbaxy's agreement, to any one of these agreements, the entirety of the market damage. And that's a mismatch. But the point of Comcast has to do with proof, does it not? Individualized proof versus predominant common proof. It does. The problem in Comcast was that when you had an expert report that could not pick out the one theory that required predominant, the common proof, you had a lack of predominance, which was fatal. Here, it's common proof. No, here it's the same thing. That is, the four different theories of liability. Well, stop. You just put the rabbit in the hat. When you say the four different theories, have I misunderstood? I understood this just the way Judge Smith described it. Their assertion is when you've got a generic who introduces the generic modafinil, that alters the price point. And it doesn't matter whether it's you or it's some other generic. If they've conspired with somebody unlawfully to withhold that generic entry, that causes the harm. And we don't care whether it's you or him or her or some other company. It doesn't matter. And, in fact, it's the same harm whether it's one or two or three of you or all of you together. Have I misunderstood their experts, though? I think so. Well, no. Their experts report, again, was done before the judge threw out the overruled conspiracy. So was it in Comcast, right? That's correct. That's correct. That's correct. That's correct. That's correct. That's correct. That's correct. That's correct. That's correct. I just want to make sure that only one of the theories went forward in Comcast. Their experts' theory about what would happen in the but-for world, and it's articulated in their papers as well, is that if any one of these four would have launched generic Bidafinil, the others would as well. In that but-for world, some of those sales to some of the plaintiffs, but undefined which ones to whom, are going to be from Mylan, some are going to be from Teva, some are going to be from Ambaxi, and so on. But they all were overcharged. They were all, under plaintiff's theory, they were all overcharged, yes. And the price would have been less if one of them had charged. And the question, though, this is just in that regard like Midwest paper, right? If we are looking just at one of these agreements, and let's take the Mylan one for example, the Mylan agreement prevents the agreement in it is that Mylan will not enter the market, right? So Mylan is off the market. The plaintiff's theory is that Mylan is nevertheless responsible for all the market damage because of actions that other people, other generics and so on, would take in response to Mylan's entry. Well, that's going to be a merits question. Yeah, I think their theory is that Mylan is a player responsible for its own decision not to enter the market because of a conspiracy, and that it is a player in a multiplayer market, that you don't have to have a conspiracy to have parallel action, and your unlawful decision to act in conspiracy with the branded manufacturer is going to have these ramifications. But, you know, you don't seem to be arguing that the joint and several liability doesn't apply generally in antitrust. You seem to be arguing that it only fails to apply in cases where you have individual actors instead of co-conspirators. In other words, your theory or argument seems to be joint and several liability can only exist in a co-conspirator world where you've got everybody in the conspiracy. Is that right? That's correct. Joint and several liability attaches to conspirators in a conspiracy, not into some other conspiracy. That's absolutely correct. But isn't the issue here whether questions of law or fact common to class members predominate over any questions affecting only individual members? Yes. All right, and that's where Comcast couldn't fulfill that. Comcast did not fulfill that. But here, how is it not fulfilled? Because the model did not match the injury and the damage in Comcast. Here, the same thing is true. And Midwest paper, I think, is important to pair with Comcast to understand why. Exactly what Judge Jordan said happened here happened in Midwest paper. That is, there was a conspiracy among paper producers. The court assumed that the plaintiff, Murray's, was injured because the market price of paper went up. That was done – he didn't purchase from the cartel. He purchased from somebody else. But that was more standing in an antitrust injury case. That's an antitrust injury case. Well, here we have antitrust injury. They were overcharged. But the question is whether they were over – whether who? Any at all. And it's back to your question. Any at all of them. But that's the question, is they have to be able to show – Each one of them. Right. By agreeing with Cephalon. Some of them would have been overcharged in the but-for award they've constructed because of the absence of some of the agreements. That is, some of them would have purchased from Teva, not from Milan. Some of them have never purchased from Milan. Wow. Listen, I've got to ask you a question about Banana Corp. Your cell phone example. Oh, sure. You had this back and forth with the other side about whether your example, your hypothetical about a cell phone manufacturer and the rare earth suppliers was a sound example. And in your last shot in your reply brief, you said in footnote six, the district court's decision would impose antitrust liability on parties whose individual agreements caused no antitrust injury. That's your language. Yes. And I just got to ask, I mean, aren't you putting – again, putting the rabbit in the hat there. Aren't you assuming what you have to prove by saying individual agreements that cause no antitrust injury? The argument from the other side is the individual agreements do cause antitrust injury. That's the point. So how do you advance the ball with a theory and a hypothetical that assumes no antitrust injury from the individual rare earth suppliers? I don't believe that is what either the district court relied on or what the other side is saying. Well, ignore what the district court said and what the other side has said and just go with my question then. Sure. Sure. Let me do it in two pieces. The example I gave you is the sort of merger to monopoly where if you have ten producers and the first two merge, where in the exact example there's a supply-output contract with two producers, those don't cause antitrust injury because the market is not concentrated enough that there's a price effect. Right. So that's sort of a hornbook proposition of law. That's precisely why the other side, I think, is saying your hypothetical is a poor one because you could have a series of contracts with individual suppliers which are not collusive and which are not contrary to the antitrust law and therefore wouldn't cause antitrust injury. But here the assertion is not that there's some supplier supply chain independent thing going on, but that there is a payment, unlawful by definition, to keep somebody off of the market. And whether you do that with one or two or three or four parties doesn't really matter because whether the parties are overcharged because of one or two or three or four different collusive arrangements is a question that might get argued about, but each one individually would have that antitrust impact. The unlawful antitrust impact. And so how does your hypothetical help anybody? The answer to that is in this case, if only, let's say, Teva had signed this agreement just as is and nobody else had, there would be no antitrust injury from Teva's agreement because Teva's agreement says if anybody else launches, we can launch too. That's why. Because of the structure of the agreements here. Run that by me again. If Teva's the only one that says. Teva reaches its agreement, right, on the terms that are reached. And let's assume those are anti-competitive. And the other three decide we're going to continue anyway. We're not going to sign settlement. Continue anyway. We're going to just sit still. No, no. We're going to continue with litigation. We're not going to sign settlement agreements. We're going to, you know, either prove the patent invalid or launch at risk or whatever we do. We're not going to settle. We're going to go forward, right? In that circumstance, Teva's agreement is entirely pro-competitive. It has no anti-competitive effects at all. Because what it does is it guarantees Teva three years of entry before the patent's expiration, whatever the result of the litigation is, and it gives Teva the right to come in as soon as anyone, not just the other three, anybody at all comes in. So there's no, that's why the example is relevant. There's no one of these agreements, and it doesn't matter whether we're talking about Teva or Barr or Ranbaxy or Milan, each of these agreements on its face has no anti-competitive effect without the others. Without the others. And the without the others feature is not the without the others feature, the insertion in each of these almost identical agreements that if somebody does launch, you can go to. I understand their argument to be, you're asserting and the district court agreed that there wasn't, that people didn't get all together and agree to do this, but that by inserting that in every one of the agreements, the incentive was given and everybody understood the incentive to be. But that's no different than the incentive in a oligopolistic market with a price leader, right? That's exactly the same thing. So this is just parallel conduct. Why isn't that a merits argument, not a class argument with respect to the predominance of the legal and factual issues that are common? Because if the damage model and injury model don't match, the Supreme Court in Comcast has said the failure to match, I can read you the example. It's not a matching. It's an individual proof versus common proof. The Supreme Court has said if the model does not even attempt to do that, which is to match the injury and damages to the theory of liability, it cannot possibly establish that damages are susceptible of measurement across the entire class for the purposes of Rule 23B3. That's right in the text of Comcast. Okay. Thank you very much. And we'll have one of you back. Mr. Gerson. May it please the Court, I'm Bruce Gerson with the appellees. I assume that you'd like me to go in the same order starting with numerosity first. I think it would be helpful. Thank you. The question was asked, is there jurisdiction in this circuit? And although appellants cited Marcus versus BMW, they obviously did not address it to Your Honor, but I think that's a very, very important decision. It's 2012 by Judge Ambrose. Right. Largely an ascertainability question, but it did deal with numerosity. It has specifically numerosity because of the exact questions that you asked, Judge Smith. It's dealing with the issue is he didn't call it factors, he called it objectives. And there were three objectives that he specifically defined. One was judicial efficiency, and I'd just like to read a very short portion of it. Courts no longer have to conduct a single administrative burdensome action with all interested parties compelled to join and be present. The impracticability of joinder or numerosity requirement also promotes judicial economy by sparing courts the burden of having to decide numerous sufficiently similar individual action seriatim. Well, that really is a statement of the overall policy reasons for having class actions. Well, right? Yes. So it is supportive. But he's also addressing it specifically to the impracticability issue. Well, it can't be the case, can it, Mr. Gerstein, that that's really the touchstone? Because if that were the case, you could say, I've got 10 people here. What a pain in the neck. I don't want to deal with 10 cases. Let's have a class action. It can't be that. It's got to be more than that. I agree. And it has to be more than that for many reasons, and certainly Walmart versus Dukes made it plain that district courts, all inferior courts in Article III, need to think about the class action as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. I agree with you. And he didn't only have that objective. He also had the objective of that there shouldn't be claimants who would be unable to bring their actions because of the inability to lead. Indeed. And here we have three absent class members who, amongst them, consist of 96-plus percent of all the damages alleged to have occurred. Right? Don't the big three swing in at more than 95 percent? I believe that's incorrect, Your Honor. But I know that defendants use that number. I believe that they took it from our brief in connection with the settlement with the Cephalon defendants, where specifically there were class members who wrote to the court supporting the settlement and supporting counsel, and the group as a whole, including the national wholesalers, was 96 percent. But I'm not disputing that they're very, very large. Yeah, like so large that we're up in the 90s at least, right? Are you going to argue with me about it? I think these are your numbers. I don't know, but I thought it was. They're large, and I'm not disputing it. Okay. So if you've got three parties, each of whom has a case that's valued in the hundreds of millions, like a half a billion dollars' worth of damages, and that accounts for approaching 100 percent of the total damages in the case, can you point us to any other case like this where somebody said, we better have a class action because those little guys are going to get hurt here? Who's got an incentive to come forward for a mere $500 million in damages? What I would suggest to you is that there are numerous cases, because there's something been over 20 similar Hatch-Waxman cases made up of the same class with the same entities. The point where I would have a dispute with you is there's nothing in the rule that says science matters. You can't have a dispute with me because I'm not taking a position. I'm asking you questions, and the question that I'm asking you is, can you point us to someplace, any case, where that kind of concentration of interest existed with three players having virtually all of the damages, 96.7 percent of the damages, where it was appropriate to say, we'd better have a representative class action here because the general rule that people should sue in their own name, it just won't work here. $500 million is not enough to get these guys to the table. I don't think the issue is getting these guys to the table. It's the vehicle to actually bring the case to court. We cited, Judge Goldberg cited, five cases with similar... But doesn't Judge Jordan's question point to what is our inquiry in A1, and that is impracticability? The question is, instead of a class, could the various class members be practically joined together, and that's the real question. One of the things that I was troubled by, is they talk about joined in the theoretical. Judge Goldberg did it in the practical. You have to look at the facts of the case. Do, look at the facts. What's impracticable about joining Cardinal Health, McKesson, and Amerisource Bergen, who are the big three, in this case? What's impractical, because those three entities could, in theory, they're located throughout the country, could bring their actions in various different jurisdictions. Sure. And you'd have to, the mechanism... We, all the time, we have MDLs, if that's really going to be a problem, or maybe they just agree, you know what, Eastern District of Pennsylvania, a swell place. Great judges, Judge Goldberg, smart, able jurists. Let's go right down there. We'll submit the jurisdiction. I mean, what's impractical about it? Well, maybe they won't, and that's the point. Maybe they won't agree to be joined. And in which case you've got an MDL. The MDL goes to the point of discovery. You're way past that. We were 10 days to trial. And the fact of the matter is, although defendants say that time shouldn't matter, the case law says you look at the actual facts specific to the case. One of the factors is, and we say in our brief, they raised three times during the case, or two times, specifically put off the class certification for similar reasons that they want, you know, for similar reasons, they want to address substantive issues. So at the end of the day, now they're arguing, hey, Judge Goldberg took too long, but he decided the substantive issues in the case. Could we really set a rule, Mr. Gersten, that says if it's late in the day, you just don't have to pay attention to things like that? I'm not asking for a rule, but it's late in the day. Well, it seems to be your argument, and it was certainly Judge Goldberg's finding, that this will put off the trial, and that's an impracticability of joinder problem. That's a numerosity problem. That is a little bit troubling because you could easily see a circumstance where delay in and of itself suddenly becomes a basis for a class certification. That's a perverse incentive. But we're not asking for delay in and of itself. But isn't delay quite apparently a major consideration that Judge Goldberg took into account? It was a consideration. He listed his considerations weighing both factors. But think about this, because we're just dealing with it. If I could just go back to the premise that I have of looking at the facts on the ground. We were ready to go to trial within 10 days. Everybody was working around the clock to get ready for trial. Motion practice, the gabbers were done in limiting motions. Everything was being set up. If you think about defendants' totality of the issues that they brought to you, they specifically brought what they call the Comcast issue, which we disagree that it is a Comcast issue, but they brought the Comcast issue. And they also moved to stay two other related parties, Apotex, who is coordinating their action, and the retailers, which are the large retail wholesale chains that have proceeding on their own. The net effect is, and what Judge Goldberg was dealing with, is if you deny class, looking at the practicalities in this case, and say that we can have joinder, at what expense? At how long? Where is the prejudice? To the fact of the matter is if you look at overall, do you delay the case further after 10 years of litigation when people are ready for trial? There's rights and interests of Apotex, and the retailers, and also the named plaintiffs who are prepared for trial. Do you allow that case to go forward, which clearly would show that joinder would be impractical, because there would be no reason specifically for those other class members to come back to Philadelphia, particularly if they didn't get the result in the trial that preceded. So when you're actually looking at the facts of the case, which is what Judge Goldberg did, and that's why the question is I think the most appropriate question, is abuse of discretion. He was weighing all these factors to really determine, is impracticability there? Is impractical joinder exists? Defendants obviously believe that this should be run in one efficient case, because they move this court to stay not only our case, but Apotex and the retailers. They use the Comcast issue as their basis, because that goes across all parties. So when they're doing that, they're saying we should all try this in one case. But if you're left with this, and that's why the lateness in this context matters. Well then is that something that should be dealt with not as an impracticability issue, not as a class certification issue, but is the argument here that your class certification objections come too late? You are making these objections so late in the day that they're not fairly considered, and that therefore you shouldn't be heard on that point, rather than as a 23A1 decision? I personally think it covers both. Well, how do you frame it as a 23A1? Unless you're prepared to make a ruling, as Judge Goldberg did, and as you're arguing for, that delay and the eve of trial becomes an impracticability of joinder issue. And if you do that, I put it to you again, then don't you create some perverse incentives where instead of getting judicial approval of a class early, as the rules suggest, people who want certification have an incentive to delay? I would agree with you 20 years ago, but the fact of the matter is that the evolution of class action law with hydrogen peroxide in those cases, as to the standards that have to be met, there is a direct relationship to the amount of substantive litigation and what's going on. Nobody rushes to certification, or rarely does anybody rush. I don't think you have a choice today. You used to 20 years ago. I don't think there's a reverse incentive. I think basically the courts recognize you have to do the legal work. Let's talk about some other incentives here. Let me return to the very simple issue of numbers, and hence the text of A1 itself. We don't have a floor established where the numbers required for numerosity. So can you point us to any other case where there is few as 22 members? Let's use the 22 number for now. I can't, but I can point you to a case in this circuit where there was 23, and I would like to just mention for the record, because we do have this in the appendix and in the record, is as a result of the settlement there were three other class members. I was going to get to that, because I understand that there is a suggestion that three additional members should be included. My understanding is that all we really have is a notice regarding transmission of notice to the direct purchasing class in the appendix with respect to that. Do you have any evidence really to support the inclusion of these three? At JA1441 is a declaration of Michael Rosenbaum, who is the administrator for the settlement, who submitted in connection with a court directive as to the notice. It says in paragraph 5 of his declaration, in the context of administering the settlement claims, Burden, who is the administrator of the company, learned that three entities in addition to the original 22 class members have received assignments of claims against all defendants, including Milon and Rambaxy. And it's signed on February 4, 2016. So was the district court clearly erroneous in saying you had 22 members in your class? I think the district court based his decision on what was known at the time, and the fact of the matter is it has nothing to do with clearly erroneous for the very simple reason is there's no numbers test. We have standards of review we have to utilize. Well, I agree with that. The fact of the matter is what the judge relied on was not clearly a flaw. There were other similar cases he pointed out. Well, nobody's suggesting it's a flaw. The question is was he clearly erroneous. Let's turn to another question. Of course not, because he found 22. May I ask a question? I'm sorry, Your Honor. Let's turn to another question, whether it's 22 or 25. What about the partial assignments that are at play in this case? Should both holders of that particular claim be counted as class members? Yes, if there's no collusion or any other relationship other than the fact is that there was a property right assigned and those people have the absolute right to do with that property right they want. That goes to the fine paper, which I think addressed this specifically and Judge Goldberg mentioned. So yes, there was no evidence of any suggestion that any assignment came out other than the ordinary course of business. It's like any other property right transfer. They independently have the right to proceed in their own claim. Some of the retailers are proceeding on the basis of assignment. They're proceeding individually in their own claim. Those are partial assignments also from wholesalers. But the fact is, my simple answer is yes, they should be counted. I ask this question because Judge Goldberg, I think, evinced a concern about this at least generally when he referred to a valid concern that a plaintiff could potentially artificially inflate the number of class members through the use of assignments. That could be a concern and if there was any evidence of that it would be something that a court would consider. But there was no evidence in this case and Judge Goldberg made that point. I do want to ask just this. You're fighting for every additional person you can add to this class. Say, no, no, it's not 22, it's really 23 or 24 or 25. And the other side is whittling away and saying, no, it's really below 20. There's three people or four people in there that shouldn't. Is that an acknowledgement, sir, that the numbers really do matter and that the lower the number gets here, you are right on the cusp and the lower you get, the harder it is to justify what happened here in the way of a class certification decision. I don't think it's actually an acknowledgement. I think the question comes down to impracticability. What difference does two or three extra make? Why is this something that you are pressing so hard that you would say this is new information, Judge Goldberg didn't have it, you ought to take it into account. Isn't there just the reality that when you're talking about these numbers and the case surveys seem to indicate it and our own precedent indicates it in your case that you're below 21, it just doesn't look right at all. I think the question comes down to the test of impracticability. The issue that you just raised is we never asserted that this is a magic number that changes anything. In fact, we took the exact opposite position in our brief. It doesn't matter whether it's 22 or 25. And we were very, very clear about that because it's the test. All we were doing is correcting the record with additional information. We took the exact opposite position. I would like to say one thing. Can I ask about impracticability? Your colleague on the other side said he did not know whether Joyner would be impracticable. Do you know? I know this, Judge. I believe that it's impracticable. The Judge Goldberg made his decision. Why? Because he applied the five-part test in Labutrin, a case that, as I said, falls directly into the... But that's a district court case. Well, but as I said, you have Marcus also who looked at... Why is Joyner impracticable? Because Joyner is impractical if you take the actual facts in this case, looking at the facts on the ground. We're saying what happens at what cost, which is the practical matter that, as I said, nobody is addressing. In this case, taking the class, which is an efficient way to go to trial immediately, is you have that on the one hand, versus if you specifically deny, reverse Judge Goldberg on the class, you're going to end up saying there's two possible effects. Well, there will be no Joyner of all the cases. Is it impracticable? Clearly, it's likely that there'll be no Joyner of the cases. And on top of that, you have a situation where defendants, when they sought their stay, was one seamless trial, is you're either going to prejudice the current parties before that, as I said, and delay them until everybody catches up to them, which could take years and years and years, or you're going to have, specifically... It's going to be a mess. You're going to have multiple trials. It's a mess. Everything that they asked for was exactly the opposite. This was at the very moment of, as I said, trial. That's why I say it's not lateness. It's really looking at the facts of the ground... Looking at the practicalities. ...and seeing whether Judge Goldberg abused his discretion. They twist and turn to try to make this as an issue of law, but he actually applied what has been standard, applied by the court, and is consistent with Marcus, exactly the objectives of Marcus. Okay, I think we've probably gotten... My red light is on. I haven't talked about Comcast. We're not paying any attention to that, as I'm sure you've noticed throughout, so move on. I'd like to, when I address the Comcast issue, I think it's very, very important to conceptually see what has happened in this case, and if I could just be given less than 60 seconds to conceptualize what this case is about. You have a monopolist who's selling an undifferentiated product at a monopoly price because it's the only one in the market. You have four potential competitors who want to sell the same undifferentiated product at specifically a lower price. The more that sell the product, the lower the price, but there's no question that if any one of them came on the market, it would have market-wide effects. And even Cephalon would introduce its own generic. And Cephalon would have introduced its own generic, so it would be a minimum initially of five. You have a situation here specifically where, and this is where we're talking about defendant's examples where we have to really depart from each other. Every example they gave is an accretion of market power to the point you get to be a monopolist. So they gave examples of multiple agreements that ultimately lead to an accretion of power where they have monopoly power for an entity. This case is different. This case, Cephalon already had its monopoly. This was about Cephalon paying off four discrete entities, any one of which would have ended their monopoly. That's why you have, if you're looking at Mylon or you're looking at Rambaxy, and to deal with this, if you're looking at either one of them, either one of them had, they could have prevented clearly the maintenance of the monopoly by just coming to market and competing instead of getting a payment. That's the theory. Well, what effect is it? If they came in alone, it would have one price. But in this case, the evidence is specifically that it would have triggered the other entities to come to market. So the fact is, their individual conduct has the entire market-wide effect. So that's, in that sense, it's just like a traditional horizontal price-fixing problem, right? I mean, they seem to be arguing that they're not independently responsible for super-competitive prices. But that's just the same as you would find in a traditional horizontal price-fixing model, right? It is. Because if anyone breaks and goes in, you're going to have the market forces operating the way they would have operated in this instance, according to your expert, right? Yes, and because of the facts in this case, specifically, the effects would be the same. Our legal standards are different, and we argued specifically in front of Judge Goldberg that he was in error in denying the, in granting the motion for summary judgment on the overall conspiracy. But the effect is the same. One of the things that defendants keep on saying is what our expert opined on, which I think is very, very important. Because our expert is an economist. Our expert is specifically looking, not as to if Mylon went first, or Rambaxy went first, or Teva went first. He's looking at what is the effect if any of them went. It would matter if it was a differentiated product, but that's not the case here. The effect for any of the agreements would be the same. How do you distinguish Comcast? For me, Comcast is there were different economic theories that was not applicable to the entire class. Here you have the same theory as applicable under either theory. The economics are the same because of the nature of the agreements. You know, they keep on saying, and I'm not quite sure I understand it, but as long as Teva went, that is pro-competitive. Teva was the first one bought off. That doesn't change buying off Mylon. It doesn't change buying off Rambaxy. They had a choice to make. Either take a payment, or compete. Or they could have actually seen the litigation through. They didn't have to say, I'm going to take a payment, but I don't have any responsibility because the other guy did it also. That's basically their argument, saying, you know, when they're dealing with it. I was thinking of an analogy for this, and, you know, analogies always have certain weaknesses, but if you're thinking about what's really happening here when dealing with the indivisible injury, if you have four lifeguards around a pool, and you have somebody in the middle drowning, and any one of them could have saved that person, but they sat around the pool doing nothing and just watching it, it's no excuse to say the other guy could have saved them. That's the same thing here. Any one of the four could have, one, prevented the entire harm by just competing. That's our claim. One of the issues they make is, and this is a distinction we have between the indivisible injury theory and the overall conspiracy is, in the indivisible theory, we're not attributing Teva's conduct to Mylon. What we're saying specifically is if Mylon did wrong, if Mylon, one, if we establish that they entered into an agreement where they received a large payment to induce them not to come to market, and in fact, which we have to prove on our causation, they otherwise would have come to market, we would have had to prove to a jury, then there are consequences, because not only would they have come to market, but it would have triggered everybody else to come to market. One issue, and Judge Randall, you raised the point, is they didn't mention the recent Supreme Court decision in Tyson Foods, but it's relevant here because it clearly goes to, what they're arguing is the merits. It's the same merits for the class as it is for... Common proof. Well, they're saying that our claim is defective because we can't, they say that there's a distinct harm that occurs from each agreement versus the indivisible harm as a result of it. So they're saying specifically that, you know, there's a defect. Well, if there's a defect in our case, and that's why they moved to stay the other matters, there's a defect in the other cases. All they're saying is there's a merits defect in one of the elements of our claim. And it's just wrong. If you think about the fact is, and where we depart, is they keep on coming to the point and raising the point of an accretion of market power. But that's not the case here. It's very, very important to understand what's happening. Similar to the lifeguards, is here you had a situation where it was the failure to act, it was the failure to compete that caused the entire market harm. And you can't basically separate that. So when our economist does the modeling, he's doing that, it's our job, independent of that, to establish causation to meet the legal standard. And that's what we do. So they take issue with that. Judge Goldberg considered that. And he found that our model clearly matched our theory. And he found our theory was cognizable under the law. Now we still have to go and prove it in front of a jury. But that's the reality of it. So I never understood this as a Comcast issue. I always saw this as an issue. But after they appealed, Tyson Foods came down, which addresses this issue directly. No? We have nothing further than... Mr. Gersten, thank you very much. Thank you. And we'll ask the appellants to provide rebuttal. I'll try to be brief and take you up on your offer. Let me have a minute. Starting with absolute basics that everyone knows, we all know class certification is the exception to the rule. And that's because there's a strong preference for us to face our adversaries. And that kind of dovetails right into what does impracticable mean, which is what Judge Rendell's been asking a number of questions about. Well, let me ask you a question. I know I'm imposing on your rebuttal time here, but I do have a quick question for you, Mr. Baldrige. The argument for Mr. Gersten seemed to be, in effect, the defendants made this bed and Judge Goldberg was making them lie in it, and there's nothing wrong with that. It was an appropriate exercise of his discretion to be saying, under those circumstances, it became impracticable to join everybody. But that's not anybody's fault but the defendant's. So it's not... They shouldn't be heard to come in here and say, in effect, we shot our parents and were orphans. Make them live with what they did. I think the reality of that, Judge George, is I could spend 30 minutes on whose fault was whose and who did what that got us 10 years into this case. For purposes of the 53 seconds I have left, all I can say is disagree with it, that we made our own bed, and you still have to look at what impracticable means. And regardless of whether we made our own... Does impracticable take into account that history of litigation conduct? Is that something that we need to be thinking about when we assess the discretion of the district court judge? Careful to say this. I don't know of a case that looks at that issue, nor do I know of factual support for what Mr. Gerstein is arguing now before you in the record that we created our own situation. But we get to impracticable. We know it can't mean it's difficult to join. We know it's not that. Your questions, we know it doesn't mean it's easier to proceed with a class action because we know that class actions are the exception to the rule. So where do you end up with deciding what is impracticable and when is it impracticable to join? Well, we're assuming, and the questions I'm hearing are like, well, it would be hard to join. Well, it may be hard to join, but there's no guarantee that it won't be hard to join these parties. And there's a number of scenarios we haven't talked about. All of them could file in the Eastern District of Pennsylvania. It's where they usually file anyway. There could be transfer. There were questions about the possibility of MDL. It might not be the easiest thing to do, but that's not the standard of impracticability. Is it easier to proceed with a class action? But nor is joinder speculative or hypothetical. It's can you bring them all together in one place? Possibly, yes. Bring them against their will, perhaps. I'm not sure. Well, there's two answers to that. One is possibly through transfer, yes. And secondly, that's not the definition of impracticable, and I can't give you the perfect definition of impracticable because no court has given it to me. And third, that's where numerosity comes in. In this case, we have 18 plaintiffs that have been proven. We've got three that are challenged due to the gaming with the assignments that we see in all these cases, and we've got three that... What other cases have you seen assignments? What other cases have you seen questions... In Nexium, I've seen them in Nexium. I've seen them in Opana. I've seen them in Soledad. I've seen them in... I can go through it. The assignment is a pretty common way of proceeding. The bottom line is before you are 18 class members. Eighteen class members, three challenged, three for which there is no record evidence before Judge Goldberg, as you pointed out. You are in a situation where it is possible, although maybe difficult, to join, and you're being asked to affirm the certification of a class that is smaller than any hash-waxman antitrust class I have ever seen, and I suggest that there has ever been. I don't... Be careful about your previous question. That's where you are. And joinder is possible, albeit maybe difficult. What's the standard? What does impractical mean? That's what we've been ticking around here. Thank you. That's a very, very interesting question. Gentlemen, thank you very much for your very helpful arguments for the excellent briefing, which we saw from the Amici as well. This is a substantial case, a very interesting case. You all know there's been plenty of ferment in the area of Rule 23 at the Supreme Court level and elsewhere for the last so many years. This case is further testament to that. We thank you for your very, very helpful advocacy. We'll take the case under advice. And we will recess at this time. Thank you. Thank you.